# MURRAY *v.* HILTON.

EQUITY PRACTICE ; AMENDMENT ; PARENT AND CHILD ; PRESUMP-
TIONS.

1. When the bill of complaint in an equity case charges actual fraud, but the testimony, when taken, shows that if any fraud existed, it was constructive merely, the bill should be amended before hearing.

2. The deed of a child recently attained to majority made to a parent at the latter's request is not presumptively or *prima facie* void.

3. When in a suit in equity by a daughter against her mother to set aside a deed made voluntarily to the latter about three months after the daughter had attained her majority and conveying an interest in real estate inherited from the father, the testimony showed that the property had been acquired mainly by the earnings of the mother during her married life, and complainant's brothers and sister had also united in conveying their interest in the property to the mother when they became of age, and no fraud or deception had been practiced upon complainant, who had acted with full knowledge of the circumstances, it was *held* that the deed was a valid conveyance.

No. 523.   Submitted February 4, 1896.   Decided April 7, 1896.

HEARING on an appeal by the complainant from a decree in a suit to set aside a deed of certain real estate.   *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Franklin H. Mackey* for the appellant :

Under the circumstances of this case, the act of the appellant in conveying to her mother, without pecuniary consideration, and when the appellant had but recently attained her majority and was not yet emancipated from her parent's control, was induced by the influence of her mother and the desire to comply with her mother's wishes, especially as she was told the property was really the mother's, and her deed was *prima facie* void.   Schouler Dom. Rel.,

sec. 272 ; *Tate* v. *Williamson*, 2 Ch. App. 55 ; *Cocking* v. *Pratt*, 1 Ves. 400 ; *Archer* v. *Hudson*, 7 Beav. 551 ; *Savery* v. *King*, 5 H. L. Cas. 626 ; *Turner* v. *Collins*, 7 Ch. App. 329 ; *Wright* v. *Vanderplank*, 8 DeG., M. & G. 134 ; *Houghton* v. *Houghton*, 11 Eng. L. & Eq. 134. Among the American cases may be cited the following : *Bergen* v. *Udall*, 31 Barb. 9 ; *Berkmeyer* v. *Kellerman*, 32 Ohio, 239 ; *Miller* v. *Simmonds*, 72 Mo. 669 ; *Harkness' Appeal*, 32 Pa. 263 ; *Taylor* v. *Taylor*, 8 How. 183.

*Mr. J. J. Darlington* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court :

The appellant, Annie G. Murray, filed her bill from the dismissal of which she appeals, on June 20, 1894, to set aside a deed made by her to the appellant, Mary Hilton, her mother, on August 31, 1889, whereby she conveyed all of her interest in the estate of her deceased father. At the time of said conveyance, which recites a consideration of ten dollars, the appellant was twenty-one years, three months and twenty days old.

Patrick Murray, the father of appellant and husband of appellee, died in December, 1872, seized of the lots in controversy, which were then worth about $6,000. There were one lot and two parts of lots. These were poorly improved. The family lived upon one and leased the others for about $25 to $35 per month. Patrick Murray married appellee in 1862, and died leaving five children, one of whom died about three years after him.

The bill alleges that the complainant made the deed without consideration ; that " she was presented a paper by her mother, the defendant, and told to sign the same, which complainant did ; that complainant, at the time, supposed that it was some paper having reference to her father's estate, and which, by reason of her interest therein, it was necessary for her to sign ;" that about sixty days before filing her bill she was told by " a relative " that she " had

signed away her rights in her father's estate ;" and that this was the first intimation " that she was not then, as she had all along believed herself to be, the owner of a one-fourth interest in whatever property he had died seized of." It was further alleged that, at the time of the execution of the deed, " she was not only ignorant of its purport, but had no idea of the amount or nature of her interest in her father's estate, other than that she was entitled to a one-fourth share of whatever it might be ; nor did the defendant, or any one else, at the time of executing said deed, or at any time thereafter, except as she has since learned from her counsel, explain, or offer to explain, to her what were complainant's rights to her father's estate, or the amount of her interest therein ; and only within a short time has she learned from. her counsel of her rights therein and the value thereof."

There has been a complete failure of proof to establish the charge of imposition in the procurement of the execution of the deed.

It appears clearly, and largely from complainant's own testimony, that she knew the location and condition of the property, and that she inherited one-fourth thereof as one of the four surviving children of her father.  She was not deficient in intelligence or education and fully understood the object and meaning of the deed that she signed at the time of its execution.  No deception was practiced and no coercion exercised.

It is true, however, that complainant had but recently attained her majority ; that she lived with her mother at the time ; that she had no other property, and that she received no pecuniary consideration.

The allegations of actual deception practiced upon complainant, and of her ignorance of the contents and effect of the deed when she executed it, have been virtually abandoned, though there has been no amendment of the bill. The contention now is, that the deed conveying all of complainant's interest in her father's estate, having been made without consideration and shortly after coming of age, to

her mother, with whom she lived at the time, is *prima facie* fraudulent in law, and void; and that the defendant has failed to make proof of facts sufficient to overcome that presumption.

This contention has very little, if any, foundation in the allegations of the bill, the gravamen of which is the fraudulent procurement of the execution of the deed through the practice of actual deception in respect of its contents and effect.

Good practice certainly enjoined the amendment of the bill after the substantial shifting of the grounds of relief made necessary by the proof. Remarking that counsel need not be surprised if hereafter a more strict compliance with the rules of practice in respect of conformity between allegations and proof shall be enforced, we will assume that there is sufficient foundation for the foregoing contention in some general allegations of the bill, and under the prayer for general relief, and therefore consider it.

Whatever may be the rule obtaining in England, or this country generally, we must hold, in obedience to the rule laid down by the Supreme Court of the United States, and remaining unchanged, that the deed of a child, recently attained to majority, made to a parent at her request and without consideration, is not presumptively or *prima facie* void. *Jenkins* v. *Pye*, 12 Pet. 241; *Taylor* v. *Taylor*, 8 How. 183.

The point, however, involves a legal abstraction of little or no practical importance in the decision of the case. All the facts that surround the transaction and elucidate its character are before us with little conflict on material points; and it is from them that the conclusion must be deduced.

Without doubt, all transactions between parent and child, and others between whom certain fiduciary relations exist, are, and ought to be, regarded by courts of equity with jealousy and scrutinized closely; and if there be found the slightest taint of unfairness or of advantage taken of the influence of the relation, they should unhesitatingly be undone.

Where those relations are contractual and active, as in the case of trustee and beneficiary in a deed or will, of guardian and ward, and of attorney and client, and the like, the safest rule is, to declare void, on grounds of public policy and utility, all conveyances made by the *cestui que trust*, and so forth, upon his application therefor within a reasonable time, subject, of course, to the return of any actual benefits received. Where, however, the relations are not of this active and positive character, but are imputed, in equity, to certain special circumstances and conditions that may exist for a time between particular persons, or in a particular case, the rule cannot, with good reason, be made so exacting.

As before suggested, in such cases, the scrutiny will be close and jealous for the protection of the weaker party, and especially ought this to be so where there is no adequate consideration; but a conveyance will not be declared void merely because without valuable consideration, if otherwise free from taint of undue influence.

The scope of the equity jurisdiction and the rule of its exercise in this class of cases is well stated in a leading English case as follows :

" The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Wherever two persons stand in such a relation as that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have

been impeached, if no such confidential relation had existed."   *Tate* v. *Williamson*, 2 Ch. App. 55.

The evidence in this case shows that appellee reared her children and educated them as well as could be expected of one in her circumstances.   She treated them with kindness, and exercised nothing but a proper and wholesome restraint. In fact, it was rebellion against such restraint that caused complainant to leave her home nearly four years after the deed had been made.   Although she well understood, at the time of its execution, the terms and legal consequences of her conveyance, she expressed no dissatisfaction therewith until just before the institution of her suit.   It appears, too, from the allegations of her bill, that the present ground of attack upon the conveyance, if not an afterthought, was not, at least, prominently in her mind, or that of her counsel, at that time.

On the other hand, it appears that the appellee, while the children lived with her, sought and obtained a similar deed from complainant's elder sister, and also, it seems, from her two brothers.   All of the deeds were made at her request. She considered herself as justly entitled to the whole of the property, and the children recognized the justice of her claim, though no deception was practiced upon them in respect of its want of foundation in law.   It had been acquired during the coverture and had been conveyed to the husband, Patrick Murray; but it seems well established by the evidence that its acquisition had been due chiefly, if not entirely, to the capacity, industry, and thrift of the wife. Patrick Murray was twenty-six years older than his wife, and had accumulated no property before marriage.   He had been a soldier, a waiter in hotels chiefly, and a driver of a public carriage.

Immediately after the marriage the wife procured a small sum of money from her mother, with which she opened a small grocery and liquor store.   The business was managed and conducted by her, with little or no assistance from her husband.   With the earnings of the store the property was

purchased and partly improved.  Appellee continued the
business, after the death of her husband, with success, and
supported her family and improved the property.  She considered the property rightfully her own, though she realized
the fact afterwards that, under the law, the title had become
vested in her husband, and could only be divested through
conveyances from his heirs at law.

The facts were known to the children, and we think it
apparent that the deeds from complainant and her sister
were freely and voluntarily made in the execution of what
they regarded as a moral obligation.

The elder sister, now a married woman, testified as a
witness for defendant.  Her conveyance was made May 21,
1888.  She was engaged then to be married, and her
mother suggested that, as a stranger was coming into the
family, she would like to secure herself.  She asked her
daughter if there was anything she owed her from her
father's estate.  The daughter replied "no ;" because, as she
explained, she thought her mother had made it all, and
therefore she was glad to convey it to her.  Complainant
was present and asked to be permitted to make a similar
conveyance.  She went with the elder sister to the office of
the attorney where her deed was signed, and was told by
him that she herself was then too young to make a deed.
When complainant made the deed in controversy in August,
1889, the elder daughter went with her to the same attorney and saw her execute it.  The purpose and effect of the
deed were explained to her before she signed it.  This part
of her testimony was corroborated by the attorney who
prepared the deed and the notary who certified to its execution.

Defendant admitted that she had the deed prepared for
complainant to execute after she attained to her majority,
and that she said to her, " Annie, are you willing now to
sign the deed, the same as Jennie signed ? "  Annie inquired if she should go that day, and was told that the next
day would do.  On the next day she went with the elder

sister (Jennie) to the office of the attorney, to execute and acknowledge the deed. Since the execution of the deeds, appellee has made valuable improvements upon the property, and it has greatly increased in value. What that increase has been does not clearly appear from the evidence.

Notwithstanding the complainant's knowledge of the effect of her deed and her apparent readiness to make it, it seems that the immediate cause of its execution was the solicitation of her mother. Where a daughter has continued to live with the mother, though recently attained to majority, without change in the natural trust and confidence of the relation, it may well be that an earnest request of that mother would have something of the weight of a command that it would be difficult to refuse. On that account, we would be inclined to resolve all doubts in favor of the complainant, and decree the cancellation of the deed, if it were not for the facts set forth above concerning the acquisition of the property, through the labors of the wife, and the knowledge and recognition thereof by the children. Those account reasonably for the solicitude of the mother, and relieve her conduct from the presumption of a desire merely to procure an unconscionable advantage through the improper exercise of her parental influence. They account also for the readiness with which the complainant obeyed the request, showing, with reasonable certainty, that her act proceeded, not from the exercise of undue influence, but from a sense of moral obligation and a desire to do a praiseworthy act. In this view of the case we do not feel warranted in disturbing the decree affirming the validity of the conveyance.

We are gratified to know that our conclusion finds support in a decision by the Supreme Court of a State, where, unrelieved by these equitable considerations, the doctrine respecting the validity of conveyances by children to parents has been carried to the extreme length of appellant's contention. *Knox* v. *Singmaster*, 75 Iowa, 64. In that case, Singmaster owned a farm. In 1877, after the death of his

D. C.]                    Syllabus.

wife, he conveyed the farm to his three minor children. The conveyance was without consideration, and was made to place the land beyond the reach of creditors. He married again and returned to the farm in 1878, making many repairs and improvements. Plaintiff, who was one of the children to whom the conveyance had been made, lived with her father until 1881. She went to live with her grandfather until early in 1884, and then returned to her father, with whom she remained about eighteen months. During this last stay she attained her majority, and four days after, at his request, conveyed her interest in the farm to her father without other consideration than her sense of moral obligation. Shortly after leaving home she married against her father's wishes, and brought the suit to cancel her deed. The court refused relief on the ground that there was no fraud or undue influence and that the deed was voluntarily made for what the grantor deemed a praiseworthy object.

For the reasons given, *the decree must be affirmed, with costs to the appellee ; and it is so ordered.*